# COUNTY OF LINCOLN.

## WILLIAM AYER *versus* REBECCA WARREN & al.

The general rule of law is, that a married woman cannot make a binding contract, or be the subject of a suit; but if there has been a *desertion* by the husband, in the ordinary meaning of the term; and their separation has been long continued, and is so complete that he must be regarded as having renounced all his marital rights and relations, — such a case would be an exception to the rule, and she would be treated as a *feme sole.*

Evidence that the separation was by the mutual consent of the parties, and that provision for a separate maintenance of the wife was made by the husband, *tends* to prove such a renunciation, but does not render the conclusion inevitable that the husband has renounced all his marital rights.

The rights of the parties, in such a case, (on a contract made in 1856,) are not materially affected by the statutes of this State, giving to married women the power to hold and manage their property, and to enforce remedies, in their own names, when it has been taken or injured.

REPORTED by MAY, J.

ASSUMPSIT on the defendants' joint promissory note, dated at Rockland on the 4th day of June, 1855, for $550, in three months, payable to the order of the plaintiff.

Rebecca Warren alone defended, the other defendant, Edward Everett, having been defaulted.

The action was commenced on the 17th day of Oct., 1856, and, at the January term, 1859, the female defendant pleaded the general issue with a brief statement of coverture at the time of executing the note.

At the trial, the plaintiff read in evidence the note declared on.

For the defence, *Leonard Cooper*, of Montville, was called, and testified:—" some twenty years ago I knew Rebecca Warren. She married Samuel S. Warren. I was present at the marriage. She was the widow Everett at the time. She lived first at Clinton, as the wife of Warren."

*Cross-examined.*—" The name of her son, by her former husband, was Edward. The marriage was at Montville. Warren was a lawyer. They removed from Clinton to Albion. I saw them there. Do not know that they lived together since I saw them at Albion. Have not seen Warren within 14 or 15 years. As I understood, he went to Massachusetts :" which statement, as evidence, was objected to by defendants' counsel.

"After living with her husband in Albion, she returned to Montville, remained eight or ten years; then removed to Rockland. While living in Montville, her home was about a mile from mine. Her son Edward and two daughters lived with her. While there she did business in her own name. She held my notes payable to her, which I paid her. Her husband did not live with her while she was there."

It was admitted, that defendant and her husband separated before the date of the note, and have never lived together in this State since that time.

*Artemas Libbey*, called by plaintiff, testified in substance, that he now resides in Augusta; formerly practiced law in Albion; was in the office of Samuel S. Warren, as a student, from the year 1841 to 1844; in April of 1844, Warren left there to reside in Foxboro', Massachusetts; corresponded with him at that place till about 1851; Warren has never lived in Albion since he left in 1844; most of his unsettled business was left with me; a day or two before he left, his wife re-

moved to Montville; they agreed to live separate; to my knowledge he has not lived in this State since 1844; he was at Albion a few hours in 1847 or the year after; have done business with and for the female defendant in her own name since her separation from her husband, in 1847 or 1848 collected a note for her; visited Warren at Foxboro,' Massachusetts, in 1846; was there four or five days; he appeared to be permanently settled there, (objected to by defendants' counsel.) About a year ago, was informed that he was residing with his son at Mobile.

The plaintiff was called by his counsel as a witness and testified:—"I am acquainted with Mrs. Warren. When she lived in Montville she resided about a mile from me. Her husband did not live with her while she was there. She went to Rockland to reside, and afterwards, in April, 1836, removed to Boston."

Witness stated, on *cross-examination*, "I do not know that the note was for the benefit of Ayer & Everett. Edward Everett told me at the time the note was made, that he wanted the money and had obtained his mother's signature to it, and wished me to indorse it, that he could get the money at the bank; I did so, and after it was protested, I took it up."

The case was thereupon taken from the jury, the parties requesting that the evidence might be reported to the Law Court for decision, according to the legal rights of the parties, on so much of the evidence as is legally admissible.

*L. W. Howes*, for the plaintiff, argued that the evidence in the case was a sufficient answer to the defence of coverture. There was a desertion of the wife by the husband in 1844, which has continued ever since. He abandoned his residence, closed his business and left the State, (abjured the realm.) He has never since returned here to reside. The desertion and residence, as disclosed by the evidence, are equivalent to a residence in a *foreign* State. *Abbott* v. *Bailey*, 6 Pick., 89.

There can be no reasonable controversy as to facts in this case, and the law applicable to the case appears to be well

settled. *Gregory* v. *Pierce,* 4 Met., 478; *Abbott* v. *Bailey,* before cited; *Gregory* v. *Paul,* 15 Mass., 31.

The doctrine of the case of *Gregory* v. *Pierce,* as laid down by C. J. SHAW, is decisive of this. There the plaintiff failed for want of proof of desertion. He was able to show only a temporary absence of the husband, caused by his being insolvent when he went away. There was no evidence of a separation between him and his wife. Here, there is no proof or pretence of insolvency; the evidence is clear of separation from and desertion of the wife—the abandonment of his business and of his residence in this State; of the wife's doing business, taking and collecting notes in her name.

Having for so many years availed herself of the privileges and benefits, which the law allows to one thus deserted by her husband, she ought not now to be permitted to escape from liability for her contracts, on the plea of coverture.

The law, as applicable to women thus situated, does not limit them in their authority to make and take contracts, or do business of any kind, in their own name, nor make any exception as to their *power* or *liability,* but gives them the full benefit of entering into all sorts of business and connecting themselves with all kinds of business relations; as SHAW, C. J., says, " she may make and take contracts, and sue and be sued in her own name as a *feme sole,*" thus treating her as a single woman for the purposes of business.

The courts make no exception whatever as to her liabilities. That would be as unjust towards her as it would be to deprive her of acting in her own name, for that would be the effect.

In *Gregory* v. *Paul,* the Court remark,—" And the same reason applying, where the husband had abjured the realm, the wife was allowed to sue *as a widow* for her *dower.* In such case, also, she has been permitted to alien her land without her husband. She may be sued as a *feme sole.* She might make her will. She might, in *all things,* act as if her husband were dead; and the necessity of the case requires that she should have that power."

In this case the husband of the defendant has virtually "abjured the realm," by abandoning his residence in this State, and going to reside in another of the United States, as is well settled in the said case of *Abbott* v. *Bailey.*

Sometimes, in England, there has been a distinction made in the rule, where there has been a separation and *maintenance furnished by the husband,* he *still remaining within the jurisdiction;* but, in this case, there is no maintenance, neither has the husband remained within the jurisdiction, where we could reach him by process.

*Gould,* for the defendant, Rebecca Warren:—

If the plaintiff can recover against the female defendant, who is a married woman, upon the note, given, not for *necessaries,* but as *surety;* he can do so, only, upon the ground that, at the time of the execution of the contract, her husband was *mortuus civiliter.*

Counsel cited and commented upon the early cases on this subject. *Lady Belknap's case,* reported in the Year Books, 2 Hen. 4th, 7; *the case of the wife of Thomas Wayland,* reported in the 19th year of Edward the first, referred to by Lord COKE, 1 Co. Litt., 133, a; *Walford* v. *the Duchess of Pienne,* 2 Esp. Rep., 554, and, in same vol., p. 587, *Franks* v. *same; De Gaillon* v. *Victoire Harel L'Argle,* 1 Bos. & Pull., 357.

And later cases, where the law is more definitely settled— *Marshall* v. *Rutter,* 8 Term Rep., 545; *Marsh* v. *Hutchinson,* 2 Bos. & Pull., 226; *Baggett* v. *Frier & al.,* 11 East, 301, and note to this case, in Day's American edition, p. 304, and cases there cited; *Edwards & ux.* v. *Davis,* 16 Johns., 281. See, also, Bayley on Bills, c. 2, § 3; Chitty on Bills, p. 22; *Gregory* v. *Paul,* 15 Mass., 31; *Abbott* v. *Bailey,* 6 Pick., 89; *Ames* v. *Chew & Tr.,* 5 Met., 320.

In the more recent case of *Gregory* v. *Pierce,* 4 Met., 478, the former Massachusetts cases were reviewed, and the law is clearly stated. Apply the rule, as adopted in that case, to this, does the evidence offered by the plaintiff, (the burden

being on him,) "render the conclusion inevitable" that here was a total renunciation of the marriage relation; "embracing both the fact and intent of the husband, to renounce, *de facto*, as far as he can do it," that relation? Does it conclusively establish the *mors civilis*, indispensable to the restoration of the wife, to all her rights as a *feme sole*? Could the defendant, at the date of the note, upon such proof, have maintained an action to recover her dower in the lands of which her husband was seized, during coverture, *as his widow?*

The argument of *necessity* cannot arise in this case. The note was not given for necessaries of life, nor in any transaction beneficial to the defendant. She is simply a surety.

It is not to be presumed that a husband intends a total renunciation of his marriage relation, simply because he and his wife agreed to live separately. There may be good reasons for a separate maintenance, or a separate residence, which would by no means be sufficient to warrant a dissolution of the matrimonial bond. As, in this case, both the husband and the wife had families, by former wife and a former husband. These families could not be agreeably-commingled.

Even if there be no question, as to the admissibility of the testimony, "that they separated by mutual consent," if the testimony be taken in its largest significance, it fails to prove the *mors civilis*, which it is indispensable for the plaintiff to establish to entitle him to maintain this suit.

Does the fact of voluntary separation, and the going to another State, with the design of residing there, and a continued residence there until 1856, *exclude the idea* of an intended re-union at some future day?

Does it *conclusively* establish *a total abandonment* of the wife, in the *absence* of proof that he did not support her during the separation? Especially, as it *affirmatively appears* that he *left property in this State*, and returned here at least to look after it.

He was a native of this State, and may be presumed to have the *animus revertendi* spoken of in some of the cases cited. He was not again married.

In *Lady Belknap's case,* the ground was, that there was a "*deportation forever* into a foreign land" of the husband; he being *attainted of a felony.* The cases against the *Duchess of Pienne,* as also the case of *Abbott* v. *Bailey,* 6 Pick., 89, were put upon the ground that the husband was *never* a citizen of the country. So also in the case of *Gregory* v. *Paul,* the husband there *deserted* the wife in a foreign country, had *abandoned* her for a great number of years, in his own country, and had never been within the United States.

In *Frank's* case against the *Duchess of Pienne,* 2 Esp., 578, it was said that, if it had been the case of an *Englishman,* the case would be different, as he might be presumed to have the *animus revertendi.*

The agreement to live separate, and the *fact* of living separate, and the wife doing business as a *sole trader,* even though the husband be domiciled in a foreign country or state, does not make out a case for the plaintiff; as is established by the cases of *Marshall* v. *Rutter* and *Marsh* v. *Hutchinson,* cited above. And, in the *latter* case, it was held, by Lord ELDON, that in order to restore a married woman to her right to make contracts, the circumstances must amount to the *civil death* of the husband, and the wife be entitled to dower, and be put *in the same situation as if he were actually dead.*

In the case of *Bogett* v. *Frier & al.,* the husband had abandoned the wife and gone *beyond the seas.* She had, for several years, contracted as a sole trader, receiving no support from, nor having any communication with her husband; still, it was held, that she could maintain no action, even to protect *her own property.*

These cases are all *much stronger* in their facts, than the case at bar. So is the case of *Gregory* v. *Pierce,* 4 Met., 478, for in that case it was *agreed* that the husband made no provision for the support of the wife and family, and that he *abandoned her* fourteen years before his death; he living all the time in another State, still she was held not liable for necessaries.

I think no case can be found where the husband has been

held to be civilly dead, on such facts as have been proved in this case. And I submit, that the *circumstance* that this is not a debt for *necessaries*, taken in connection with the *absence of proof* that she was left without proper provision by the husband, and the *affirmative* proof that he had property in this State, is one of great weight.

Even if the defendant had been left without the proper means of support, when her husband went to Massachusetts, there is no necessity of assuming that he was civilly dead; for, by the statutes of this State then in force, c. 87, R. S., 1840, § 22 to § 27, inclusive, she might have been authorized, on application to the Supreme Court, to make contracts in her own name, and to prosecute and defend suits.

The enactment of that statute shows that the rule of the common law was not regarded as extending to the facts of such a case as this; otherwise, there could be no necessity of making such a law. Section 22 provides that "the Supreme Judicial Court, on application of any married woman, whose husband has absented himself from the State, *abandoning her*, and not making sufficient provision for her maintenance, may empower her" to make contracts in her own name. This section embraces more *facts* tending to establish the *civil death* of the husband, than the plaintiff has made out, viz. : — The *abandonment*, while the plaintiff shows only a *mutual agreement* of separation; an *absenting himself from the State;* and *not making provision for her support,* which the plaintiff does not show.

The opinion of the Court was drawn up by

TENNEY, C. J.—Rebecca Warren, one of the defendants, denies her liability on the note in suit, because, at the time she signed her name thereto, she was the lawful wife of Samuel S. Warren, then in full life. And the question before the Court is whether, under the facts reported in the case, the plaintiff is entitled to recover against her. In *Corbett's* case, as stated in 1 Dane's Abr., 357, the learned author, "Lord MANSFIELD, and the Court, held the general

rule to be, 'that a married woman can have no property, real or personal;' her contracts are entirely and universally void; for her contracts, even for necessaries are the contracts of her husband; she cannot be sued or taken in execution. Then the exceptions to this rule are, as when the husband *is in exile,* or has *abjured the realm;* and credit has been given to the wife alone. So in the case of *transportation,* though temporary, because she acts as a *single* woman; and gains credit as such. So if the husband resides abroad, his wife is liable to be sued."

That a suit may be maintained against a woman who has a husband living, as if she were a *feme sole,* has long been settled in England and in this country. But eminent English Judges have differed in relation to the principle, which, on being applied to cases, would render her liable or otherwise. It was not doubted, under the jurisprudence of that country, that she might be sued alone on her contracts, or for her torts, when her husband was banished; when he was an alien enemy; was transported, though only for seven years; or when there was a judicial divorce from bed and board.

It has been supposed, by those who most strongly resist the liability of the wife while her husband is living, that it is upon the ground that he is *civilly* dead. *Marshall* v. *Rutter,* 8 T. R., 545. On the other hand, Lord MANSFIELD and others have held the wife liable on her contracts, in cases in some respects similar to those in which other Judges have treated them as exempted, on the ground of a separation, between the husband and wife, the agreement to live separate, and a separate maintenance in favor of the latter. *Corbett* v. *Poelnitz,* 1 T. R., 5. The test of the wife's liability by the former class of jurists, has been pronounced unsound, as the rule cannot be universally true; as, for example, it cannot with propriety be said that the husband is civilly dead, when his wife cannot be married again; when he is an alien enemy; has been transported and in exile; when no administration of his estate can be granted, no descent to his children; and no dower can be assigned in it. 1 Dane's Abr.,

335, in which it is said, " so are clearly the best authorities."
The doctrine of Lord MANSFIELD was attacked by Lord
KENYON, when he declares, " that to take the wife in execution,
when sued alone, is a divorce between her and her husband."
This argument has been regarded of little force at most, be-
cause no inconvenience to the husband can· arise, when, by a
valid agreement, the husband and wife live separately and
there is a separate maintenance ; and why may not the execu-
tion run against the separate property secured to her ? *Clay-
ton* v. *Adams*, 6 T. R., 604 ; 1 Dane's Abr., 360.

In the case of *Ringstead* v. *Lady Lanesborough*, 23 Geo. 3,
B. R.,— Cooke's Bank. Laws, 24, decided in 1783, which was
assumpsit for goods sold and delivered, upon the plea of cov-
erture, and replication that she lived separate from her hus-
band at the time of making the promise, and that she had a
large and sufficient maintenance secured to her by deed ; and
a special demurrer to this replication ; the replication was ad-
judged good, and the plaintiff had judgment.

In·*Barwell* v. *Brooks*, 24 Geo. 3, B. R.,— Cooke's Bank.
Laws, 28, decided the next year, which was also assumpsit
against the wife, on her separate promise, for goods delivered
to her, she was held liable though her husband resided in
England.

The case of *Corbett* v. *Poelnitz*, before cited, was one which
was presented to the Court soon after the two last cited, and
the result was similar, they being regarded as authority and
cited in the case by. BULLER, J.

In the year 1800, the case of *Marshall* v. *Rutter*, before
referred to, was decided by Lord KENYON and his associates,
in which decision Lord Chief Justice EYRE, who heard the
first argument, concurred. After the decisions upon this ques-
tion, in Lord MANSFIELD'S time, the law as to the wife's liabil-
ity seemed to have been altered, but, upon the announcement
of the judgment in·*Marshall* v. *Rutter*, the old law was thought
to be restored ; and the former decisions have been treated
as overruled by the latter case. *Gregory* v. *Paul, Ex'r*, 15
Mass., 31.

These two classes of cases, according to the reasoning of the decisions respectively, appear to rest upon principles not reconcilable one with the other. But Mr. Dane, in his Abr., vol. 1, p. 339, says, " It was natural for Judges, &c., opposed to such separations, vastly multiplied, to sieze on these defects in the articles of separation, to discountenance those modern inroads on the marriage state; and one way was, in *Marshall* v. *Rutter*, to hold the wife, separated, not capable to contract, so as to be alone suable, as this at once placed her in a humble, subjected state, so that no one would trust her; a state in which her friends would not be much inclined to place her. It must be admitted that this wife ought to be suable as a *feme sole*, until she is restored to the condition of one in relation to her husband, that is, until she has the rights of a *feme sole*, as to her separate property, and rendered no longer liable to have her person, society, or personal services ever after claimed by her husband. Now, upon close examination, it will be found that, in Rutter's case, and in every case in which the decision has been against this separate liability of the wife, there has existed one or both of these defects in the articles of separation. Either her separate maintenance has been clearly inadequate, and a mere fraud upon her, or not effectually, or not permanently secured to her, or her husband has retained some right at some time to seize her person, or to claim it, with her society, and, of course, her services. In either case, the reason of her liability fails. It is true, though such defects have been so discoverable in these cases, they have not always been expressly mentioned by the Judges, in giving their opinions. On the whole, it is very clear, the cases of *Barwell* v. *Brooks*, *Ringstead* v. *Lady Lanesborough*, *Corbett* v. *Poelnitz*, &c., remain unshaken, if we examine the cases themselves, and do not hastily rely on the reasoning in them." And the learned author remarks, on page 357 of the same volume, " In *Corbett's case*, LAWRENCE, J., truly observed, that the husband had no rights to the person of his wife afterwards." And, on page 335, " on examining the cases carefully, it will be found she cannot be sued, though living

separate, when her husband has not renounced his right to her person. And that she may be sued alone, when he has renounced this right, and she may bind herself, so as to be sued alone on her contracts, whenever his marital rights are not affected by them, and there is .no coercion. And it is upon this.ground, when her husband is an alien enemy, as he contends, that he has no rights which can be affected by her being sued alone and imprisoned." And on page 361 he remarks, " on the whole, though there have been several *dicta,* contrary to the decision in the case of *Corbett* v. *Poelnitz,* yet there has been no decision directly contrary to it, or that can materially shake it. In *Marshall* v. *Rutter,* the wife had no remedy for her maintenance, as she could not sue her husband."

It is not understood that, in English Courts, the decision of *Marshall* v. *Rutter* has been overruled, as applied to the facts of the case, but is treated as being in harmony with previous·decisions, though the exact principle on which they respectively rest has not been always distinctly enunciated. But it is believed that, in no case, in that country, has the test of LAWRENCE, J., before quoted, that the wife cannot be sued alone, because her husband *had not renounced his marital rights* to her person, society, service, &c., been denied to be true.

The separate maintenance secured to the wife effectually, upon a separation, and other facts in cases referred to, may be regarded as evidence of a renunciation by the husband of his marital rights. But, when this effectual renunciation has been fully established, it is believed that no case can there be found, denying to the wife the power to bind herself by her contracts, and making her liable to be sued thereon.

In this country, the question has been examined by able jurists and Courts, and although the decisions have not always been in all respects consistent with each other, but still the great principle referred to has not been repudiated, expressly.

Judge REEVE, in his work on Domestic Relations, holds the wife, while her husband is living, suable merely on the

principle, that her husband *has renounced his marital rights*, not on the ground of separate maintenance; as, if so, that would be the measure of her liability. 1 Dane's Abr., c. 19, art. 10, § 5.

In the case of *Gregory* v. *Paul*, 15 Mass., 31, the English authorities were fully examined, and, it appearing that the husband deserted his wife in a foreign country, and she maintained herself, and for five years had lived in Massachusetts, the husband being a foreigner, and never having been in the United States, it was held, that she was competent to sue, and be sued as a *feme sole*, and her release would be a valid discharge of any judgment she might recover, upon the ground that the case fell within the spirit of the rule of the common law, founded in reason and necessity, in case of exile and abjuration.

The case of *Abbott* v. *Bailey*, 6 Pick., 89, was an action of trover, brought for a note running to the plaintiff, a woman having a husband living. The defendant pleaded in abatement, that the plaintiff was under coverture of Peter Abbott, who was then living in New Hampshire, under proper pleadings, which resulted in an issue of law on demurrer; it appeared that the plaintiff was driven from her husband, and her home, more than twenty years before. She had all the time acted as a *feme sole*, and been treated as such by those with whom she had had dealings. The husband had considered the connection as at an end, and had married, and was then living with another woman. And it was admitted that this separation was caused by the cruelty and ill usage of the husband. He obliged the plaintiff to live separately from him, and to obtain her own living, and she had sustained herself in the State where she resided. According to the principle of *Gregory* v. *Paul*, her action was maintained. In both these cases, the facts showed that the husband had renounced his marital relations.

The case of *Gregory* v. *Pierce*, 4 Met., 478, was a suit upon a promissory note signed by the defendant, a married woman, and submitted on an agreed statement of facts. She

was married in 1806 ; her husband, in 1816, became insolvent
and went out of the State, and did not return till 1818, when he
came back and remained with her about a week.    He then left
her and went to Ohio, where he remained till. his death in 1832.
He made no provision for the support of his wife and family,
after he left her in 1816, but she supported herself and family
by her own labor, contracting debts, and making contracts
in her own name.    The note was given for a balance of ac-
count between the parties thereto.    SHAW, C. J., in deliver-
ing the opinion of the Court, remarks, "The principle is to
be considered as established in this State, as a necessary ex-
ception to the rule of the common law, placing a married
woman under disability to contract or maintain a suit, that
when the husband was never within the Commonwealth, or
gone beyond its jurisdiction, has wholly renounced his mari-
tal rights and duties, and deserted his wife, she may make
and take contracts, and sue and be sued in her own name as
a *feme sole*.    It is an application of the old principle of the
common law, which took away the disability of coverture when
the husband was exiled or had abjured the realm."    But it
is held, that the separation must be voluntary, from an aban-
donment of the wife, embracing both the fact and intent of the
husband to renounce *de facto*, and so far as he can do it, the
marital relation, and leave his wife to act as a *feme sole*.

By the statutes of this State, married women enjoy rights
entirely unknown to the common law, touching the ability
to hold and dispose of property independent of their hus-
bands, and also to enforce remedies, when their property is
taken away or injured, without joining them in suits, which
they may institute.    But it is not perceived that the case
now before us is in any manner affected by those statutes,
and further consideration thereof is unnecessary.

It appears, from the evidence in the case, that many years
ago, the defendant, Rebecca Warren, was married to Samuel
S. Warren, in the town of Montville, and immediately moved
to Clinton, both towns in this State, and, after some time, they
moved to Albion, in this State, and cohabited together as man

and wife. They separated by mutual consent; and he left Albion in April, 1844, saying, as he was leaving, that he was going to Foxborough, Massachusetts, to reside there, and he never lived in Albion after that time. His wife moved to Montville, a day or two prior to his leaving Albion. He was in Foxborough as late as 1846, in the fall, apparently making his home there. His wife continued to live in Montville after the separation, till she removed to Rockland in this State, and thence to Boston, the latter in April, 1856. She has done business in her own name, while she lived in Montville, holding notes in her own name, and receiving payment therefor; and had a family residing with her, the children of a former marriage. The separation took place before the date of the note in suit, and the parties to the marriage have never since lived together. The husband was a member of the legal profession, and did business as such. No imputation is shown to rest upon the moral character of either, which can be treated as unfavorable, aside from their mutual agreement to live separate from each other.

The general rule being, that a married woman cannot make a binding contract, or be subject to a suit, the plaintiff must show, by sufficient proof, that she falls within the exception.

The fact of the desertion of the husband from his wife, according to the ordinary meaning of the term has not taken place. The desertion was nothing more than the separation, which took place under an agreement between them. It was not a desertion, under the statute of 1841, c. 80, § 2, as would authorize, under that provision, a dissolution of the bonds of matrimony. Nothing is proved, showing that the separation was designed to be perpetual, farther than its continuance since it took place.

No separate maintenance was provided by the husband, much less, that it was sufficient, or made effectual permanently, by any contract which could be regarded as binding; the separation being "by mutual consent," and no intervention of trustee, or other contracting parties. The husband and the wife cannot be regarded as under any legal prohibition

from putting an end to the separation, whenever it should suit either to do so. It appears from the evidence that both resided in the State of Massachusetts in the year 1856, after removal there; and there is no evidence or admission that they have not lived together in that State, or elsewhere since that time, aside from what may be inferred from other facts in the case. Whether he has or not provided a home for her, if she was willing to return to him, and whether he is of pecuniary ability to support her on her return, or otherwise, are questions to which the case has given us no direct answer. We are not satisfied that the separation is so complete, that he is to be treated as *having renounced his marital rights and relations.*                                        *Plaintiff nonsuit.*

RICE, APPLETON, CUTTING, MAY and GOODENOW, JJ., concurred.